UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JASON LEOPOLD, | ) |
| | ) |
| PLAINTIFF | )   Civil Action No. 1:13-cv-1324 (JEB) |
| vs. | ) |
| | ) |
| DEPARTMENT OF JUSTICE, | ) |
| | ) |
| | ) |
| DEFENDANT | ) |
| | ) |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

### Introduction

This case arises under the Freedom of Information Act, 5 USC § 552.  Plaintiff Jason Leopold is an investigative reporter who requested from the Department of Justice the 300-page Executive Summary to the Senate Select Committee on Intelligence's report on the Central Intelligence Agency's detention and interrogation program.  Before the Court is Defendant's motion to dismiss on the basis that the requested document is not an "agency record" subject to the Freedom of Information Act.  For the reasons stated herein, Defendant's motion should be denied.

### Statement of Facts

Abu Zubaydah was captured in March 2002.  (Ex. 1 at App. B.)  At the time, officials at the Central Intelligence Agency (CIA) "assessed that Abu Zubaydah had specific information concerning future Al-Qa'ida attacks against the United States." (Ex. 2 at 2.) After the initial interrogation of Abu Zubaydah, senior CIA officials concluded that he

1

"was withholding information that could not be obtained through then-authorized interrogation techniques." (Ex. 1 at 3.)  Facing pressure to do everything possible to prevent future terrorist attacks, "attorneys from the CIA's Office of General Counsel met with the Attorney General, the National Security Adviser, the Deputy National Security Adviser, the Legal Adviser to the National Security Council, and the Counsel to the President in mid-May 2002 to discuss the possible use of alternative interrogation methods that differed from the traditional methods used by the U.S. military and intelligence community. At this meeting, the CIA proposed particular alternative interrogation methods, including waterboarding." (Ex. 1 at 3; Ex. 2 at 3.)

The Department of Justice (DOJ) Office of Legal Counsel (OLC) orally advised the CIA in July 2002 that the "Attorney General had concluded that certain proposed interrogation techniques were lawful[.]" (Ex. 2 at 4.)  The following month, OLC memorialized its conclusions in two written opinions (an unclassified narrative of which is located at pages 4-6 of Exhibit 2.)  In the opinions, OLC opined that ten specific "Enhanced Interrogation Techniques" would not violate the criminal prohibition against torture, 18 USC §§ 2340-2340B. (Ex. 1 at 4.)  After obtaining approval from the DOJ and the National Security Advisor, the CIA commenced its use of "Enhanced Interrogation Techniques" against Abu Zubaydah and other "high-value" detainees who were, or would come into, U.S. custody.  (Ex. 2 at 6.)

In May 2004, the CIA Inspector General issued a classified special review of the CIA's detention and interrogation program (the unclassified version of which is contained in Exhibit 1.)  (Ex. 2 at 7; Ex. 1.)  After the issuance of the special review, "the CIA requested that OLC prepare an updated legal opinion that incorporated actual CIA

experiences and practice in the use of the techniques to date included in the Inspector General review, as well as legal analysis as to whether the interrogation techniques were consistent with the substantive standards contained in the Senate reservation to Article 16 of the Convention Against Torture." (Ex. 2 at 8.)  The Senate reservation to Article 16 defined the phrase "cruel, inhuman and degrading treatment" as the treatment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution.  (Ex. 2 at 8.) "Thus, the CIA requested that OLC assess whether the interrogation techniques were consistent with the substantive provisions of the due process clause, as well as the constitutional requirement that the government not inflict cruel or unusual punishment." (Ex. 2 at 8.)  In June 2004, OLC withdrew its unclassified August 1, 2002 opinion on the anti-torture statute, but did not withdraw the classified August 1, 2002 opinion which "did not rely on or interpret the President's Commander in Chief power or consider whether torture could be lawful under any circumstances."  (Ex. 2 at 8.)

Just over two years later, President Bush "publicly disclosed the existence of the CIA's detention and interrogation program." On September 6, 2006, the same day as the announcement, "the CIA briefed all Committee Members about the CIA's detention and interrogation program, including the CIA's use of enhanced interrogation techniques." (Ex. 2 at 14.)  Although certain techniques were discontinued, the detention and interrogation program did not end until January 22, 2009 when President Obama issued Executive Order 13491 on "Ensuring Lawful Interrogations," limiting the interrogation techniques that may be used by officers, employees, or other agents of the United States Government.  (Ex. 2 at 15-16.)

* * *

3

Two months after the issuance of Executive Order 13491, the Senate Select Committee on Intelligence (SSCI) announced that it was undertaking its own review of the CIA's detention and interrogation program, to "fully understand the creation and operation of the CIA detention and interrogation program." (Ex. 3.)  Over the next three years, the SSCI obtained more than 6 million pages of material, including "cable traffic, reports, memoranda, intelligence products, records of interviews conducted of CIA personnel by the CIA's Office of the Inspector General and other CIA entities, as well as internal email and other communications." S. Rep. No. 113-7, at 13 (2013).

After conducting its review of the material, the SSCI produced an exhaustive report on the CIA's Detention and Interrogation Program (hereinafter "the Report") that exceeds 6,000 pages and contains approximately 35,000 footnotes.  S. Rep. No. 113-7, at 13.  The Report contains three sections: History and Operation of the CIA's Detention and Interrogation Program; Intelligence Acquired and CIA Representations on the Effectiveness of the CIA's Enhanced Interrogation Techniques; and Detention and Interrogation of Detainees.  *Id.* at 13-14.  At his confirmation hearing to be CIA Director, John Brennan described the Report as "rather damning" and explained that it discussed "mismanagement of the program, misrepresentation (inaudible) information, [and] providing inaccurate information[.]" (Ex. 4 at 30.)

The Report, according to Sen. Ron Wyden and other committee members, reveals that the CIA lied to the Department of Justice, the White House, and other agencies about the efficacy of its interrogation program. (Ex. 11.)  In preparing the Report, the SSCI scrutinized the legal opinions authorizing the CIA's use of enhanced interrogation techniques.

On December 13, 2012, the Committee approved the Report by a vote of 9 to 6.  S. Rep. No. 113-7 at 13.  The dissenting Senators filed their minority views on February 15, 2013, expressing their "disagreement with the report's conclusions, particularly regarding the effectiveness of the program and the CIA's representations to policymakers, and explained their reasons for opposing the final report."  *Id.* at 14.

The Committee provided copies of the Report to the Central Intelligence Agency, the White House, the Department of State, the Department of Justice, and the Office of the Director of National Intelligence, with a request that the White House coordinate comments from all relevant Executive Branch agencies.  *Id.* at 14; (Brinkmann Decl., Ex. B).

*  *  *

Following the SSCI's vote to approve the Report, many of its members have called for its declassification and public release.  Sen. Sheldon Whitehouse wrote in a letter to a constituent, "I believe that the report should be declassified as soon as possible, with portions released in redacted form if some content must remain classified…. I think that allowing the public to know the facts will strengthen our nation's commitment to legal forms of interrogation without damaging our national security." (Ex. 5 at 1-2.)

Senator Mark Udall has been vocal in calling for the Executive Branch to make the document available, indicating that he might hold up the nomination of the CIA's next General Counsel if he did not receive a commitment from the White House to declassify the report. (Ex. 6.)  Udall has called on the White House to make a public statement committing to "the fullest possible declassification" of the Intelligence Committee's

study before he would commit to supporting the nomination of the CIA General Counsel. (Ex. 6.)

SSCI Chairwoman Sen. Dianne Feinstein said in a statement last July that she "planned to ask the White House and C.I.A. to declassify its 300-page executive summary." (Ex. 7 at 1.)  White House spokesperson Caitlin Hayden responded that "some version of the findings of the report should be made public."  (Ex. 7 at 2-3.)

During Brennan's confirmation hearing, Sen. Martin Heinrich asked Brennan if he would "object" to a "public release of a truly *declassified* version of the Committee's report?" (Ex. 4 at 116)(emphasis in original). Brennan responded, "Senator, I would give such a request for declassification every due consideration. There is a lot of information and material in those volumes with a lot of potential consequences, as far as its public release. And at the same time that we have a commitment to transparency, we also, though, have a tremendous commitment to making sure that we keep this country safe by protecting its secrets. There are a lot of equities as far as liaison partners, other types of things, operational activities, maybe source and method, so it has to be looked at very, very carefully." (Ex. 4 at 116.)

Sen. McCain issued a press release calling for the "declassif[ication of] this report, so that all Americans can see the record for themselves, which I believe will finally close this painful chapter for our country." (Ex. 8 at 2.)  Vice President Biden expressed his agreement with Sen. McCain that the Report should be made more available to the public.  (Ex. 9 at 1.)

## **Summary of the Argument**

The D.C. Circuit and the Supreme Court have articulated several tests by which to evaluate whether a document is an agency record under the Freedom of Information Act. The D.C. Circuit's tests examine the intent of the non-FOIA entity at issue to relinquish control of the record, while the Supreme Court has rejected any intent-focused analysis. The Supreme Court's test is the appropriate binding precedent in this case and the Court should follow it.  Under the Supreme Court's test, the Court can easily find that the Report is an agency record.

Even applying either of the two tests embraced by the D.C. Circuit, however, the Court must find that the Report is an agency record.  The SSCI prepared its highly classified Report on a CIA program, information about which was tightly controlled by the CIA.  The Executive Branch, not the SSCI classified the Report and imposed special controls on its distribution.  The SSCI does not have the ability to declassify and release the Report, only the Executive Branch can do that.  To the extent that the SSCI appeared to be restricting access to the Report, its actions are ambiguous given the absence of record evidence regarding the nature of the access restrictions imposed by the CIA.  What members of the SSCI have made clear, however, is that they fully support release of the Report, or at a minimum, the Executive Summary.

## Argument

### I.    Standard of Adjudication

a.    <u>The Court must convert Defendant's motion to dismiss under Rule 12(b)(1) into a motion for summary judgment.</u>

Defendant moves to dismiss pursuant to Fed. R. Civ. Pro. Rule 12(b)(1).  [ECF dkt: 17.]  However, a motion to dismiss for lack of jurisdiction is not an appropriate vehicle for adjudicating whether a document is an "agency record" under the FOIA.  The question of whether a document is an "agency record" is properly decided on a motion for summary judgment if matters outside of the pleadings are considered, or on a motion to dismiss pursuant to Rule 12(b)(6) if matters outside the pleadings are not considered.  *See e.g.*, *American Small Bus. League v. United States SBA*, 2008 U.S. Dist. LEXIS 65905, at *6-7, 2008 WL 3977780, No. C 08-00829 MHP (N.D. Calif. Aug. 26, 2008) ("The SBA's [12(b)(1)] motion is more appropriately understood as a Rule 56 motion for summary judgment presenting the question of whether the materials requested by the League are 'agency records' within the meaning of FOIA"); *McKanney v. Dep't of the Navy*, 2013 U.S. Dist. LEXIS 157785, at *6-*7, 2013 WL 5913380, Case No. 13 Civ. 1535 (KBF)(S.D.N.Y. Nov. 4, 2013)("Though the Supreme Court has framed the issues raised by FOIA dismissal motions in jurisdictional terms, *see DOJ v. Tax Analysts*, 492 U.S. 136, 142, 109 S. Ct. 2841, 106 L. Ed. 2d 112 (1989), the trend among courts in this and other circuits is to analyze such motions under Rule 56"); *Cause of Action v. Nat'l Archives & Records Admin.*, 926 F. Supp. 2d 182, 189 (D.D.C. 2013)(deciding "agency record" issue on motion to dismiss pursuant to Rule 12(b)(6) where court declined to consider declarations submitted by agency).

Although a court will not typically convert a motion to dismiss under Rule 12(b)(1) into a motion to dismiss under Rule 12(b)(6) or a motion for summary judgment under Rule 56, there is an exception "when the same statute provides the basis for determining both jurisdiction and the merits of the case." *Loughlin v. United States*, 230 F. Supp. 2d 26, 36 (D.D.C. 2002).  In such a circumstance, the "jurisdictional question is intertwined with the merits of the case, [and] a Rule 12(b)(1) motion *must* be converted to a Rule 56 or 12(b)(6) motion[.]" *Id., citing Bell v. United States*, 127 F.3d 1226, 1228 (10th Cir. 1997)(emphasis added).  Because the FOIA provides both the jurisdictional basis for the court's decision as well as the basis for a decision on the merits, and because both parties are submitting material outside the pleadings, the court must therefore convert the Rule 12(b)(1) motion into one for summary judgment.

Pursuant to this Court's local rule LCvR 7(h), a motion for summary judgment must be accompanied by a statement of facts as to which there exist no material dispute. Although strict compliance with this rule is required, the statement of facts is not required to take any particular form. *See Jackson v. Finnegan, Henderson, Farabow*, *Garrett & Dunner*, 101 F.3d 145, 153 (D.C. Cir. 1996).  Because Defendant's motion contains a "Statement of Facts" section, and because denying Defendant's pleading based on failure to comply with Rule 7(h) would unnecessarily delay the proceedings, Plaintiff will treat Defendant's "Statement of Facts" as a Rule 7(h) statement and respond accordingly.  *Cf. id.*

 b. <u>Summary judgment is only appropriate where, after the underlying facts and inferences are drawn in favor of the FOIA requester, the defendant agency demonstrates it has fully discharged its duties under FOIA.</u>

It is well-established that "[i]n a FOIA case, summary judgment may be granted to the government if the agency proves that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." *AFGE, Local 812 v. Broad. Bd. of Governors*, 711 F. Supp. 2d 139, 147 (D.D.C. 2010)(internal quotation marks omitted). A requester may challenge the government's showing by "set[ting] out specific facts showing a genuine issue for trial, Fed. R. Civ. P. 56(e), that would permit a reasonable jury to find in his favor." *Id.* (internal quotation marks omitted).

 c. <u>The agency bears the burden of demonstrating that the documents sought are not "agency records," and a variety of tests have been applied to determine whether or not the government has met that burden.</u>

Although the Freedom of Information Act applies only to "agency records," the Act does not define that term.  The Supreme Court has held, however, that a record is an "agency record" under FOIA if an agency (1) either creates or obtains the record, and (2) is "in control of the requested materials at the time the FOIA request is made." *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144-45 (1989)("*Tax Analysts II*").  Here, it is undisputed that Defendant obtained the Report from the SSCI.  (Def. Mot. to Dismiss at 4.) Therefore, the only question before this Court is whether the Department of Justice was in "control" of the Report at the time Mr. Leopold made his FOIA request.  The burden is on the Department of Justice to demonstrate that it was not in control of the Report at that time.  *Tax Analysts II*, 492 U.S. at 142 n.3 ("The burden is on the agency to

demonstrate, not the requester to disprove, that the materials sought are not 'agency records[.]'")

In the D.C. Circuit's own decision in *Tax Analysts*, it announced a four-part test for determining whether "an agency has sufficient 'control' over a document to make it an 'agency record.'" *Tax Analysts v. U.S. Dep't of Justice*, 845 F.2d 1060, 1069 (D.C. Cir. 1988)("*Tax Analysts I*").  In affirming the D.C. Circuit's decision, the Supreme Court in *Tax Analysts II* did not endorse the four-part control test, holding instead, "By control we mean that the materials have come into the agency's possession in the legitimate conduct of its official duties."  492 U.S. at 145.  The Supreme Court specifically rejected the argument advanced by the Department of Justice which would have made "the determination of 'agency records' turn on the intent of the creator of a document relied upon by an agency. Such a *mens rea* requirement is nowhere to be found in the Act. Moreover, discerning the intent of the drafters of a document may often prove an elusive endeavor, particularly if the document was created years earlier or by a large number of people for whom it is difficult to divine a common intent."  *Id.* at 147-48.

The holding in *Tax Analysts II* called into question the validity of not only the four-part control test announced in *Tax Analysts I*, but also the D.C. Circuit's earlier intent-based control-property test, first announced in *Goland v. CIA*, 607 F.2d 339 (D.C. Cir. 1978).  Under the *Goland* test, "Whether a congressionally generated document has become an agency record, rather, depends on whether under all the facts of the case the document has passed from the control of Congress and become property subject to the free disposition of the agency with which the document resides."  *Id.* at 347.  The majority in *Goland* adopted the control-property test over a vigorous dissent by Judge

Bazelon, who opined: 1) that the control-property test exacerbates the lack of adversariness where the plaintiff in a FOIA case is denied discovery; 2) that the majority does not say "what it meant by congressional 'control' over a document in an agency's possession; or in what sense such a document can be considered congressional 'property'"; 3) that where the agency employs the information in the requested document in making decisions with respect to policy and operations, a determination that the requested document is not an agency record would be inconsistent with the "fundamental purpose of the FOIA," which is "to open administrative policy and operations to the light of public scrutiny." *Id.* at 358-62.

In *United We Stand Am., Inc. v. IRS*, 359 F.3d 595 (D.C. Cir. 2004), the D.C. Circuit attempted to harmonize its four-part test from *Tax Analysts I*, its property-control test from *Goland*, and the Supreme Court's holding in *Tax Analysts II*.  The D.C. Circuit explained that "the connection between Congress and the requested records implicates considerations not at issue in" *Tax Analysts II*, which involved records originating from courts.  359 F.3d at 599.  The *Goland* test was the more appropriate standard to apply in *United We Stand*, the D.C. Circuit thought, because it "relied on policy considerations unique to the congressional context." *Id.*  The D.C. Circuit further held that the four-part test is not applicable where three conditions were met: 1) the request involves documents that were *created* by the agency; 2) the request involves documents that are *possessed* by the agency; and 3) the documents were created and possessed by the agency "in the legitimate conduct of its official duties." *Id.* at 602-03.  Since all three requisites were met in *United We Stand*, the four-part test did not apply.

Last year, the D.C. Circuit undertook another review of its case law concerning when a document is deemed to be controlled by an agency subject to FOIA. *Judicial Watch, Inc. v. United States Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013). In *Judicial Watch*, the court extended the holding in *United We Stand* to documents originating from the White House. *Id.* Thus, the standard four-part test would not apply to the document sought in *Judicial Watch*. *Id.* at 218. In reaching this conclusion, the D.C. Circuit explained that while the four-part test applies "[i]n the usual case," the *Goland* line of cases, "stretching from 1978 to 2004," establish that the test "does not apply to documents that an agency has either obtained from, or prepared in response to a request from, a governmental entity not covered by FOIA: the United States Congress[.]" *Id.* at 218, 221. The court then concluded that the "special considerations" which led to this conclusion in previous cases applied with equal force to the White House, in addition to Congress. *Id.* at 221.

The D.C. Circuit nevertheless examined each of the factors which are part of the four-part test before concluding that, even "by its own terms . . . the four-factor test is indeterminate as applied to" the records at issue in the case. *Id.* Applying the four-factor test alone, however, would leave the court with an "uncertain result" because the four factors point in different directions and some of the factors are ambiguous. *Id.* at 220. Because the agency bears the burden of demonstrating that the documents are not agency records, the "uncertainty would redound to the benefit of" the FOIA requester. *Id.* Thus, although the four-factor test did not "fully capture the 'control' issue" in *Judicial Watch*, *id.* at 218, the D.C. Circuit seems to have found it to at least be relevant. *See id.* at 220 ("if the four-factor test were the *only* relevant consideration, we would be left with an uncertain result")(emphasis added).

There is one more wrinkle.  As noted above, in *United We Stand*, the D.C. Circuit declined to follow *Tax Analysts II* because "the connection between Congress and the requested records implicates considerations not at issue in" *Tax Analysts II*.  359 F.3d at 599.  A reader might be forgiven for concluding that the "considerations not at issue" had to do with the fact that the records at issue in *Tax Analysts* were created by the judiciary, whereas the records at issue in *United We Stand* were Congressional.  That is not the case, however, according to *Judicial Watch*.  Both *United We Stand* and *Tax Analysts* "involve[d] records that had been created by another Branch," and the distinction between the two cases related to the fact that the originating branch, the courts in *Tax Analysts*, "did not object to their release." *Judicial Watch*, 726 F.3d at 222, n.15.  The court in Judicial Watch noted dicta in *Tax Analysts I* that the "decisions upon which courts did place limits 'probably would not be considered 'agency records[.]''" *Id., citing Tax Analysts I*, 854 F.2d at 1068, n.18.  The Supreme Court's decision in *Tax Analysts II*, while affirming the D.C. Circuit's decision in *Tax Analysts I*, did so on alternative grounds and did not discuss, let alone base its decision, on whether the originating Branch did or did not object to disclosure.  Indeed, the Supreme Court implicitly rejected any such distinction by refusing to allow "the determination of 'agency records' [to] turn on the intent of the creator of a document relied upon by an agency." *Tax Analysts II*, 492 U.S. at 147.  Of course, the Supreme Court also did not draw a distinction between documents generated by Congress and documents generated by the courts.  *Accord Goland*, 607 F.2d 346 ("FOIA's exemptions for Congress and the federal courts are In pari material[.]")

14

d.  Neither the *Goland* test nor the four-factor test apply in this case, and the Court should instead look to whether the Report has "come into the agency's possession in the legitimate conduct of its official duties"

Under D.C. Circuit precedent, this Court must apply the Supreme Court's decision in *Tax Analysts II*, which looks to whether "the materials have come into the agency's possession in the legitimate conduct of its official duties."  492 U.S. at 145.  As explained, *supra*, the "wrinkle" in *United We Stand* and *Tax Analysts I*, as construed by *Judicial Watch*, require the Court to first look at whether the originating body objected to the release of the documents.  726 F.3d at 222, n.15.  Not only does the record contain no evidence that the SSCI "objects" to the release of the Report, it contains significant affirmative evidence that its members are actively seeking release of the Report, or at least its Executive Summary.  Both the public comments of the Senators and the exchanges that have occurred with Executive branch officials during SSCI hearings make clear that the SSCI believes that at least the Executive Summary of the Report should be made public.  Accordingly, the Court must apply the *Tax Analysts II* standard.

If the Court disagrees that the "wrinkle" applies here, it is then faced with a conflict between D.C. Circuit case law, which requires an intent-based control test, and the decision of the Supreme Court in *Tax Analysts II*, which rejected an intent-based control test.  In such a situation, this Court may not disregard the Supreme Court's binding precedent.  *See Slaughter v. Parker*, 450 F.3d 224, 252 (6th Cir. 2006)("To the extent that the law of our circuit requires more, it conflicts with Supreme Court precedent and obviously cannot bind this court.")  Thus, the Court against must follow *Tax Analysts II*.

Following either the D.C. Circuit's property-control test under *Goland* or its four-part test under *Tax Analysts I*, both of which focus on intent, this Court will be faced with the

challenge of "discerning the intent of the drafters of a document[, the SSCI, a group] of people for whom it is difficult to divine a common intent." *Id.* at 147-48.  Moreover, even if the Court could be sure that it had correctly determined the intent of the SSCI, following the property-control test would lead the Court into thorny separation-of-powers issues.  *See e.g., United States v. Rayburn House Office Bldg.*, 497 F.3d 654 (D.C. Cir. 2007)(confronting separation of powers issues involved in motion for return of property by Congressman for material seized from his office by the Executive branch).

Following the *Tax Analysts II* approach in this case would be dispositive of the issue of whether the Report is an agency record.  There can be no dispute that Defendant obtained the Executive Summary of the Report in the legitimate conduct of its official duties.  Thus, the remainder of this brief will focus on how the Court should proceed if it decides to follow the four-part test or the property-control test.

As to the four-part test, at least this much is clear from the D.C. Circuit's most recent pronouncement: it is not the determinative as to the status of material obtained from Congress. *Judicial Watch*, 726 F.3d at 221 ("In a series of cases stretching from 1978 to 2004, this circuit has indicated that the standard, four-factor control test does not apply to documents that an agency has either obtained from, or prepared in response to a request from, a governmental entity not covered by FOIA: the United States Congress.") Following the lead of the D.C. Circuit, this brief will nevertheless address each of the four factors, but with an emphasis on the intent of the SSCI and the ability of the Executive Branch to use the Report as it sees fit.

II.     **The Executive Summary of the SSCI Report is an "Agency" Record and Therefore Subject to FOIA.**

A.  Defendant paints an incomplete picture as to the SSCI's actions.

Before any inferences about the SSCI's intent can be drawn by the factfinder, it is necessary to understand some basics about the national security classification system.

The national security classification system is established by executive order, not by statute. (Aftergood Decl. ¶ 3.)  Its scope and its provisions are therefore subject to unilateral interpretation and reinterpretation by the Executive Branch. (Aftergood Decl. ¶ 3); *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988)(holding that it is the Executive Branch which is entrusted with the decision "to classify and control access to information bearing on national security[.]"  This authority "flows primarily" from Article II of the U.S. Constitution and the authority of the President as Commander-in-Chief, and "exists quite apart from any explicit congressional grant." *Egan*, 484 U.S. at 527; U.S. Const. art. ii.

According to the Brinkmann Declaration, "Information within the SSCI Report is classified as Top Secret/Sensitive Compartmented Information (SCI)."  (Brinkmann Decl. ¶ 8.)  SCI or "Sensitive Compartmented Information" refers to "classified information that is derived from intelligence sources and methods."  (Brinkmann Decl. ¶ 8.)  Although SSCI may have "separately marked each paragraph of the Report itself with the appropriate classification markings," (Brinkmann Decl. ¶ 8) the SSCI did not decide what information should be classified.  "As with other classified information, Congress is not authorized to generate Sensitive Compartmented Information on its own." (Aftergood Decl. ¶ 13.)  The decision to classify or declassify documents in accordance with the

applicable Executive Order rests with officials in the Executive Branch. *In re Guantanamo Bay Detainee Litig.*, 634 F. Supp. 2d 17, 23 (D.D.C. 2009) ("the decision to disclose classified information is an Executive function"); *Stillman v. CIA*, 319 F.3d 546, 549 (D.C. Cir. 2003)(noting the "deference owed to the Executive Branch concerning classification decisions") The executive order that currently governs classification policy is Executive Order 13526 of December 29, 2009.  (Aftergood Decl. ¶ 3.)

At the direction of the NSC, the CIA designated its Detention and Interrogation Program as a "Special Access Program" or "SAP."  (Panetta Decl. ¶ 30.)  Section 6.1(oo) of Executive Order 13526 defines a Special Access Program as "a program established for a specific class of classified information that imposes safeguarding and access requirements that exceed those normally required for information at the same classification level."  SAPs are "classified programs that are deemed to be particularly sensitive or vulnerable to disclosure, and are therefore subjected to security controls above and beyond those of 'ordinary' (or so-called 'collateral') classified information." (Aftergood Decl. ¶ 7.)

"As the executive agent for implementing the terrorist detention and interrogation program, the CIA is responsible for limiting access to such information[.]"  (Panetta Decl. ¶ 30.)  It is not clear from the record in this case to what extent additional safeguards were imposed by the CIA by virtue of its designation of the Detention and Interrogation Program as a SAP.  The designation may simply mean that information about the Program is SCI, as SCI is in effect a subset of SAPs. (Aftergood Decl. ¶ 8.) Alternatively, there may be other safeguards put in place by the CIA.

The designation of information as SCI also impacts Congressional access to the information and its ability to distribute information it generates which contains SCI. "Congressional access to SCI is normally limited to members and staff of the relevant authorization and appropriations committees. The executive branch is required by law (the National Security Act of 194 7, as amended) to notify certain members of Congress regarding covert action, significant intelligence activities, significant intelligence failures, and violations of law. As a matter of course, classified intelligence information is also presented to Congress as part of the budget request and justification process.  However, the extent of such disclosures to Congress is considered to be a matter of executive discretion, and it varies over time and circumstance"   (Aftergood Decl. ¶¶ 11-12.) Further, Congress cannot "remove SCI controls that have been imposed by the executive branch" and "congressional documents that contain classified information (e.g., hearing records, staff reports, budget documents) cannot be declassified by Congress. Rather, they must undergo declassification by the responsible executive branch authority."[1]

The SSCI's actions must therefore be understood in the context of the restraints placed on it by the CIA.  For example, if the CIA only permitted the SSCI to make a limited number of hardcopies of the Report or limited the total number of people who could access the Report (as part of an SCI "billet structure" or otherwise[2]), the fact that the SSCI may have had some discretion as to who received access or copies would reflect

---

[1] "The Senate Intelligence Committee does assert a hypothetical right to publicly disclose classified information on its own volition, pursuant to procedures in Section 8 of Senate Resolution 400 ofthe 94th Congress (1976). But the validity of those procedures is not acknowledged by the executive branch. And in any case, the Committee has never once acted to disclose information or records under this Section. Accordingly, the classification and declassification of information remains a subject of exclusive executive branch control." (Aftergood Decl. ¶ 6.)

[2] P. Duse, *EEOC: The Real Deal* at 338 (2010) ("Each compartmented program has only a limited number of program access slots.  DASC-RS can not exceed the number of access slots assigned to the programs they manage.")

no more than secondary control over material ultimately within the CIA's control and dominion.  Given that Defendant bears the burden of demonstrating that the Report is not an agency record and that reasonable inferences must be drawn in favor of Plaintiff as the non-movant, Defendant's motion must be denied for the reasons stated below.

   B.  <u>The steps taken by the SSCI to prevent the unauthorized disclosure of classified material in the Report do not indicate that the Senate intended to retain exclusive control of the Report.</u>

Although the record is incomplete regarding the SCI or SAP access controls placed by the CIA on information about its Detention and Interrogation Program, the evidence that is in the record suggests that the SSCI was doing no more than attempting to prevent the unauthorized disclosure of highly classified information.

Defendant has provided three documents in support of its Motion to Dismiss – a declaration from a Department of Justice attorney, Vanessa R. Brinkmann; a transmittal letter sent by Sen. Feinstein to the President and copied to the heads of five agencies (Def. Exhibit B); and an email from an SSCI staffer to several Executive branch employees (Def. Exhibit C).  The thrust of each of these documents is that the SSCI sought to limit the number of individuals who had access to the Report.  However, neither the email nor the letter explains on its face *why* the SSCI was limiting access to the Report.  The Brinkmann Declaration speculates that the SSCI was limiting access to the Report to "preclude the Department [of Justice]'s ability to use the document 'as it sees fit,'" (Brinkmann Decl. ¶ 9) but it is far more likely that the SSCI was instead simply attempting to comply with its legal and ethical duties governing classified and otherwise confidential documents.

A variety of statutes govern the handling of classified or otherwise protected information.  For example, under the Espionage Act, a person lawfully having possession of a document relating to national defense is prohibited from lawfully transmitting it to a person "not entitled to receive it" or, through gross negligence, permits the document to be removed from its proper place of custody.  18 U.S.C. § 793 (d) and (f)(1).[3]   Under the Espionage Act, a person is entitled to receive the information only if they have both the required security clearance *and* a need-to-know the information.  *United States v. Rosen*, 445 F. Supp. 2d 602, 622-23 (E.D. Va. 2006).  Senators and their staff are not exempt from the scope of the Espionage Act[4] and, moreover, have independent ethical and legal duties to maintain the secrecy of confidential or classified information.[5]

It is unclear whether the CIA limited the number of hardcopies of the Report that the SSCI could distribute to Executive Branch officials.  If it was the CIA that imposed the limit, it could hardly be said that the SSCI was the entity attempting to control access to copies of the Report.  However, even if the CIA did not cap the number of hardcopies and it was instead the SSCI's decision to limit the number of hardcopies that would be available, a reasonable inference can be drawn by the factfinder (and must be drawn, at the summary judgment stage), that the intent of the SSCI Chair and members was simply

---

[3] For a full discussion of criminal statutes relating to the handling of classified information, see J. Elsea, "Criminal Prohibitions on the Publication of Classified Information" (R41404), Congressional Research Service, Sep. 9, 2013.

[4] *Gravel v. United States*, 408 U.S. 606, 626 (1972).  Senators enjoy immunity under the Speech and Debate Clause for certain legislative acts and thus may not be subject to prosecution by the Executive Branch, but this immunity from prosecution does not make a violation of the Espionage Act any less illegal.

[5] Senate Rule XXIX(5) ("Any Senator, officer, or employee of the Senate who shall disclose the secret or confidential business or proceedings of the Senate, including the business and proceedings of the committees, subcommittees, and offices of the Senate, shall be liable, if a Senator, to suffer expulsion from the body"); S. Res. 388 (88th Congress) (Senate Ethics panel may "receive complaints and investigate allegations of improper conduct which may reflect upon the Senate, violations of law, violations of the Senate Code of Official Conduct, and violations of rules and regulations of the Senate"); S. Res. 400 (94th Congress)(Senate Ethics panel is authorized " to investigate any unauthorized disclosure of intelligence information [from the Senate Intelligence Committee] by a Member, officer or employee of the Senate.")

to avoid unauthorized disclosure.  If, in their judgment, the SSCI and its Chair were limiting the number of hardcopies solely to avoid unauthorized disclosure, the only intent that could be inferred is an intent to not act in a negligent or reckless manner with highly classified national security information.  If, as Defendant contends, the Report was distributed to the Executive Branch for the limited purpose of soliciting comments, the corresponding "need-to-know" would necessarily have been limited to a small group of Executive Branch officials.  Unauthorized disclosure of even highly classified documents is not a hypothetical fear.  Leaks of the CIA's response to the Report began three months before the agency delivered its formal response, according to Sen. Feinstein. (Ex. 7.)  "I am appalled by the persistent media leaks by anonymous officials regarding the C.I.A.'s response to the committee's study," Feinstein told *The New York Times*, adding, "Leaks defending the C.I.A. interrogation program regardless of underlying facts or costs have been a persistent problem for many years.  This behavior was, and remains, unacceptable." (Ex. 7.)

In addition to the limit on the number of hardcopies of the Report, the Brinkmann Declaration avers that the SSCI and its Chair limited the number of Executive Branch officials who would be able to review the Report.  (Brinkmann Decl. ¶ 5.)  The SSCI's ability to impose such a limit is not apparent, as neither the committee nor its Chair could decide who could have access to SCI information or be "read into"[6] the SAP.  Nor does it appear that the SSCI intended to prevent (or could have prevented) additional Executive Branch officials from reviewing the Report.  Indeed, Sen. Rockefeller apparently expected that Brennan would make the Report available to all senior CIA personnel,

---

[6] The process of being "read into" a program entails being approved for access, receiving a briefing, acknowledging the briefing, and signing a nondisclosure agreement.  *See Unclassified Report of the President's Surveillance Program* at 10 n.10.

stating, "I would hope very much that you would, if you are confirmed, which I hope you will be, that you will make parts of this at your discretion, required reading for your senior personnel so they can go through the same experience that you went through. Are you willing to do that?"   (Ex. 4 at 44.)

Because the SSCI did not have the authority to legally grant or restrict access to the Report by Executive Branch officials – only the Executive Branch has that authority – any "restrictions" it sought to impose would have been merely precatory.[7]  If an agreement existed between the SSCI or its Chair and the CIA regarding access to the Report, the CIA or other Executive Branch official would still have made the ultimate decision.

Even if the SSCI did have legal authority to grant or restrict access to the Report, the committee and its chair would have had no choice but to refuse access to anyone who Defendant was unable to sufficiently explain his or her need-to-know the information in the Report.  Under such circumstances, the SSCI had a legal and ethical duty to refuse to provide the Report to those individuals, notwithstanding the fact that those individuals may have had the appropriate security clearance.  18 U.S.C. § 793 (d); S. Res. 388 (88th Congress); S. Res. 400 (94th Congress); Senate Rule XXIX(5).  Moreover, even if all of the individuals on Defendant's initial list had a need-to-know the information in the Report, the SSCI would still have had a legal and ethical duty to guard against

---

[7] That this is the case is suggested by the fact that copies of the Report were provided "with the *understanding* that they would not be Reproduced," (Brinkmann Decl. ¶ 8)(emphasis) rather than "with the *requirement* that they would not be Reproduced."  Semantics aside, there is no evidence of any formal agreement prohibiting reproduction, a curious omission on the part of the SSCI if it did indeed have the authority to make such binding restrictions.

unauthorized disclosure of the Report by restricting access to a very small group of

trusted individuals.[8] 18 U.S.C. § 793(f)(1); S. Res. 388 (88th Congress).


C. The SSCI restricted access to Report despite its intent *not* to exercise control over the Executive Summary of the Report.

Given that Defendant's evidence concerning the SSCI's actions in restricting access

to the Report sheds little light on the Senate's intention to maintain or relinquish control

of the Report, the statements of the SSCI members themselves are important to resolve

any ambiguity as to the Senate's intent.  That the SSCI restricted access to the Report

because it had to, not because it wanted to, can be readily ascertained by examining the

public statements of the SSCI members calling for the public release of the Report, or at

least its Executive Summary.

SSCI committee members, including Sen. Whitehouse (Ex. 5 at 1-2), Senator Udall

(Ex. 6), Chairwoman Sen. Feinstein (Ex. 7 at 1) have all publicly called for the

declassification and release of the entire Report (in redacted form) or, at a minimum, the

Executive Summary.

A December 20, 2013 news story published by *The Guardian*, under the headline,

"Senate intelligence committee presses CIA to release torture report," strongly suggests

the Executive Branch has the final say over the release of the Senate Intelligence

---

[8] It appears to be the practice in Washington to guard against leaks by providing highly classified information to an extremely limited number of individuals.  *See* M. Erwin, "'Gang of Four' Congressional Intelligence Notifications" at "Summary" (no page number), R40698, Congressional Research Service (Apr. 16, 2013)(describing the "generally accepted" Executive Branch practice of notifying only the chairmen and ranking members of the two Congressional intelligence committees "in order to reduce the risk of disclosure").  This makes sense as "it is logically more likely that a secret will leak out when more people are entrusted with it[.]" *Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.*, 923 F. Supp. 1231, 1254 n.25 (N.D. Cal. 1995).

Committee's study.[9]  Underscoring this point, a December 18, 2013 report published by NPR states, "There are … private disagreements about whether the committee and the CIA have a deal to release the material."[10]

An article in *The New Yorker* states, "the Obama Administration, like Bush's before it, is keeping the damning details [in the report] from public view."[11] Salon.com adds, "Right now, President Obama is preventing you from learning any of this, by keeping the report classified."[12]

If the SSCI intended to retain exclusive control over the Report, which contains an analysis of the CIA's detention and interrogation program, it seems odd that the committee would put the CIA "in the position of editing and potentially censoring an independent critique of its wrongdoing," as *The New Yorker* puts it.  It is more reasonable to presume that the CIA is in such a position because the SSCI does not believe that it has exclusive control over the release of the Report.

Exchanges between SSCI members and John Brennan at his confirmation hearing repeatedly demonstrated that the Senators believed the CIA is responsible for declassifying the Report and making it public.  For example, both Sen. Heinrich and Brennan assumed that the CIA was in control of the ultimately release of the report.  (Ex. 4 at 116.).

Although the Brinkmann Declaration submitted by Defendant claims access to the report has been strictly limited to just a handful of officials approved by the Committee Chairwoman, a statement by Sen. Rockefeller during Brennan's confirmation hearing

---

[9] http://www.theguardian.com/world/2013/dec/20/senate-intelligence-committee-cia-torture-report
[10] http://www.npr.org/2013/12/18/255275601/push-for-release-of-cia-interrogation-report-continues
[11] http://www.newyorker.com/online/blogs/newsdesk/2013/03/obamas-transparency-test.html
[12] http://www.salon.com/2013/05/06/why_is_obama_withholding_secret_torture_report_from_americans/

suggests that the SSCI believes the Executive Branch is free to, and should, further distribute the Report.  Sen. Rockefeller told Brennan that the Report should be required reading for "senior personnel" (Ex. 4 at 44.)

According to an article in *The Daily Beast*, SSCI sources said that the Report "will go to a CIA review board, which will make its own judgments about what can be released to the public and what should stay under wraps."[13] Additionally, Caroline Krass, the CIA General Counsel nominee, "will likely be a crucial player in determining how much of the report can be declassified for public release," *The Daily Beast* reported.

As Sen. Udall stated in marking the 25th anniversary of the signing of the Convention Against Torture, "The CIA, the White House, and other agencies continue their review of the committee's report on the CIA's detention and interrogation program, and the Senate Intelligence Committee expects to see an official response soon. *But this is not a report I can talk much about or share, since it remains classified.*" 159 Cong. Rec. S. 2894, 2895 (2013)(emphasis added).  "That is why I will hold Mr. Brennan to the promise he made to me at his confirmation hearing; that is, to correct inaccurate information in the public record on the CIA's detention and interrogation program. That is why I will continue to urge him to ensure that the Senate Intelligence Committee's report on this flawed program is declassified and made public." 159 Cong. Rec. S. 1241, 1242 (2013)(statement of Sen. Udall).

The numerous statements from SSCI members in favor of releasing the Report are part of what distinguish this case from others involving classified Congressional records. To be clear, Plaintiff is not arguing that all classified documents are "agency records."

---

[13] http://www.thedailybeast.com/articles/2013/12/17/the-senate-has-torture-on-its-agenda-when-it-interviews.html

*See Hall v. CIA*, 2000 U.S. Dist. LEXIS 22695 at *25 n.6, Case No. 98-1319 (PLF)

(D.D.C. Aug. 10, 2000)(rejecting argument that "any congressional document undergoing

declassification review would be subject to the FOIA irrespective of Congress' intent,

because Congress is required to allow an executive agency to decide whether or not it

may be released.")  In *Hall*, for example, this Court found that the SSCI had expressed a

"clear desire to maintain control over the documents" where: 1) boxes of classified

documents were sent to the National Archives with a letter stating that the Senate is

"transmitting . . ., for preservation and safekeeping, approximately 275 boxes of Select

Committee classified records" and that "requests for access to the classified materials

shall be directed to the Secretary of the Senate"; 2) a second letter stated that "the Senate

should be consulted regarding any records that might contain information implicating

national security"; and 3) when the National Archives sent the records to the CIA, the

Secretary of the Senate wrote a third letter stating that "a transfer of congressional control

over the Select Committee's records demonstrably has not occurred."  *Id.* at *23-*25 &

n.6.  Notably, after acknowledging that the test for whether records passed from the

control of Congress to control of an agency involves examining "all of the facts of the

case," *id.* at * 22, *citing Goland*, 607 F.2d at 346, this Court in *Hall* relied exclusively on

the *language* of the Senate's letters rather than the *actions* of the Senate in restricting

access to the documents.  The language of the Senate's letters expressed its "clear desire

to maintain control over the documents[.]" I*d.* at *25 n.6. The fact that the Senate

apparently did not transmit the documents to large numbers of Executive Branch

employees, by contrast, did not necessarily indicate the Senate's intent to retain control,

but may instead have reflected the Senate's responsible handling of the classified

documents.  In other words, the fact of classification may make it difficult to glean the

Senate's intent from its restrictions on distribution, but will not override clear and

unambiguous statements from the Senate expressly claiming exclusive control over the

documents.

D.  The SSCI does not have the ability to limit the Executive Branch's distribution of
classified material, and therefore the Executive Branch can use the Report as it
sees fit.

Regardless of the Senate's intent, the "property" portion of the property-control test

(or, in the four-part test, the ability to use the Report as the agency "sees fit"[14]) weighs in

favor of the Executive Branch having a superior claim to the Report.

First, the Executive Branch has the unilateral legal authority to declassify the Report

and if appropriate, publicly disclose its content.  See Executive Order 13526, § 3.1.

Second, and more importantly, Defendant is able to use the Report as it sees fit.  The

Brinkmann Declaration suggests that the SSCI provided the Report "for the specific and

limited purpose of soliciting suggested Executive Branch edits and comments for SSCI

consideration . . . . [B]efore SSCI would share copies of its own Report with the

Executive Branch, the Committee established the narrowly defined purpose and

extremely limited access under which it was willing to provide this SSCI document to

federal agencies."  (Brinkmann Decl. ¶ 6.)  The record evidence does not support these

conclusion, however.  The transmittal letter from Sen. Feinstein simply states, "I am also

sending copies of the report to appropriate Executive Branch agencies."  In the next

---

[14] This phrasing is somewhat misleading because an agency cannot use a document as it "sees fit" if such
use would be a violation of the law.  It appears from the record, however, that the only restriction on use by
the defendant is that the Report not be provided to unauthorized persons, but this restriction can be
unilaterally changed by appropriate Executive Branch authorities.

sentence, Sen. Feinstein "[a]sk[s] that the White House coordinate any response from these agencies, and present any suggested edits or comments to the Committee by February 15, 2012." (Brinkmann Decl., Ex. B.) The letter cannot be fairly read as limiting the use of the Report to *only* suggesting comments and edits when it contains no such limiting language. Similarly, the email from Mr. Grannis states only that copies of the Report are being provided "for review." (Brinkmann Decl., Ex. C.) Again, there is no limiting language in this communication that would suggest any restriction on the uses to which Defendant may put the report.

After completing a "damning" (Ex. 4 at 30) Report on such an important topic, the communications from the Committee could not possibly be read to mean that the Executive Branch should do nothing more than "review" (Brinkmann Decl., Ex. C) and "comment[]" (Brinkmann Decl., Ex. B) on the Report. The very nature of the Report, backed up by comments from SSCI members, suggest that the SSCI intended the Report to have deep and far-reaching effects, not simply to be a document that is reviewed and then placed on a shelf to gather dust.

The Brinkmann Declaration also places reliance on the claim that the SSCI alone has authority to amend, finalize, or disseminate the Report. "The decisionmaking authority on the amendment, finalization, and dissemination of the Report rests with SSCI . . . . [T]he Department does not have decisonmaking authority regarding the final amendments to or dissemination of the document." (Brinkmann Decl. ¶¶ 5, 10.) The first problem with this conclusion is that "it confuses control over document content with control over disposition and dissemination of the document itself. It is axiomatic that . . . Congress . . . retain[s] ultimate control over the content of the records [it] create[s]." *Tax*

*Analysts I*, 845 F.2d at 1068. The second problem with the conclusion is that the SSCI

does not have final "decisionmaking authority on the . . . dissemination of the Report"

because, as described *supra*, the Report contains highly classified material and the fact

that the CIA has designated the Detention and Interrogation Program as a SAP means that

"the CIA is responsible for limiting access to such information[.]" (Panetta Decl. ¶ 30.)

The Department of Justice appears to be constrained in its use of the Report only by

its own "close hold restrictions" which were implemented "in consideration" of the

SSCI's request and the highly classified nature of the information, but not apparently in

response to any *requirement* imposed by the *SSCI*. (Brinkmann Decl. ¶ 9.)

E. Defendant has not demonstrated that Executive Branch agencies did not read and rely on the Report.

The record reveals that the Report has been "reviewed by only a limited number of

[Justice Department] employees[.]" (Brinkmann Decl. ¶ 9.) The Brinkmann Declaration

does not explain the purpose for which those employees reviewed the report or whether

there are any restrictions on their review of the Report. Further, there is no suggestion

that those employees who have reviewed the report have been limited in their ability to

read it. *See Judicial Watch*, 726 F.3d at 219 ("It is true, as the Secret Service argues, that

its personnel read and rely upon the documents only for the limited purposes the records

serve: to enable the Service to perform background checks and verify admissibility at the

time of a visitor's entrance. But the agency reads and relies upon the documents for those

purposes without restriction, and the third factor requires no more.") Indeed, it is difficult

to imagine how the Department of Justice will respond to the Report if not by having its

employees read it.  As to whether Department of Justice employees have relied on the

Report, the Brinkmann Declaration asserts that they have not, (Brinkmann Decl. ¶ 9) but

sets forth no assertion of fact other than this conclusory statement.  There is, for example,

no explanation of how Ms. Brinkmann came to this conclusion.

Further, the Brinkmann Declaration only addresses the use of the Report by

Department of Justice employees.  News reports have made clear that the CIA has

already read and relied on the Report.  According to *The New Yorker*, Edward Price, a

media spokesman for the CIA, said in a statement that "the C.I.A. agreed with a number

of the Senate study's findings and had taken steps to address shortcomings identified by

the report[.]" (Ex. 10.)  As explained below, the third and fourth factors of the four-part

test should be applied to the entire Executive Branch rather than just Defendant.


    F.   <u>Defendant has not demonstrated that the Report was not integrated into</u>
           <u>Department of Justice or other Executive Branch record systems.</u>

Defendant asserts that the Report has not been integrated into Department of Justice

record systems, but offers no more than a conclusory statement to that effect in the

Brinkmann Declaration.  (Brinkmann Decl. ¶ 9.)  The Brinkmann Declaration provides

no factual foundation for this blanket statement.  Further, the Brinkmann Declaration

only addresses Department of Justice record systems.  As explained below, this is

insufficient. Finally, the fact that the Report is physically located in a SCIF (Brinkmann

Decl. ¶ 8) sheds no light on whether it is integrated into any record systems.

G.   Other factors suggest that the Report is an "agency record."

i.      The physical transfer of copies of the Report weights in favor of a finding that it is an agency record.

The SSCI could have, but chose not to, require Executive branch officials to review the Report at the Senate.  This is in contrast to the CIA's insistence that Senate staffers view documents at the CIA's secure facility.  (Ex. 7.)  Because the SSCI could have effectively performed its oversight function without physically transferring copies of the Report to Defendant, the fact that it nevertheless did so weighs in favor of a finding that the Report is not a Congressional record. *Cf. Judicial Watch*, 726 F.3d at 225 ("the President and his staff cannot retain effective physical control over their calendars . . . . The President thus has little choice but to permit the Secret Service to reconstruct his appointment calendars . . . . There is good reason to doubt that Congress intended to require the effective disclosure of the President's calendars in this roundabout way.")

ii.      The Report is not subject to the disclosure provisions of any other statute.

There are no other relevant statutes that would provide Plaintiff with access to the Report.  *Cf. Judicial Watch*, 726 F.3d at 228 (fact that records at issue were subject to Presidential Records Act is "not . . . irrelevant" to determination that documents were not "agency records" subject to FOIA).

iii.      The Report relates to the functioning of the Executive Branch and therefore fulfills a key purpose of FOIA.

The Report, and particularly its Executive Summary, is likely to shed significant light

on the decisionmaking functions of the Executive Branch, particularly the CIA, but also

the Department of Justice.  *Cf. Cause of Action v. Nat'l Archives & Records Admin.*, 926

F. Supp. 2d 182, 187 (D.D.C. 2013) (disclosure of records stored at National Archives

"would reveal nothing about its decisionmaking processes, a key objective of FOIA.")

One of the primary purposes of the Report, for example, was to determine whether

the CIA operated its program in "compliance with . . . [Department of Justice] Office of

Legal Counsel opinions[.]" (Ex. 3.)  Further, given that the DOJ played a significant role

in the development of the CIA's Detention and Interrogation program (Ex. 2) and an

entire volume of the Report is devoted to this topic, S. Rep. No. 113-7, at 13-14, the

Executive Summary will almost certainly shed significant light on this topic.

III.    **The need for discovery or, alternatively, for Defendant to submit further information *ex parte***

Defendant's evidence is slim and accordingly its motion should be denied because it

bears the burden of demonstrating that the Report is not an agency record.  Nevertheless,

Plaintiff recognizes that the Court may prefer to have a more complete factual record in

place before ruling.  Although Plaintiff has made every effort to ensure that the record

contains all of the information that the Court needs to decide whether the Executive

Summary of the Report is an agency record, there are many significant facts unavailable

to Plaintiff.  In order for the Court to have a fuller understanding of the intent of the SSCI

and the context in which its restrictions were imposed, the Court should authorize limited

discovery or, for classified information, require Defendant to submit an *ex parte, in*

*camera* declaration from a knowledgeable official.  Regardless of the method of obtaining the information, if the Court chooses to employ the four-part test or the property-control test, it must evaluate the SSCI's intent in restricting access to the Report and the only way it can do so is to have a complete record that includes the restrictions imposed by the Executive Branch on the SSCI's ability to disseminate information, pursuant to a SAP or SCI.

At this stage of the proceedings, Plaintiff also lacks the ability to present any evidence contradicting the conclusory claims made in the Brinkmann Declaration regarding the reliance by Defendant on the Report and the degree of integration of the Report into Defendant's record systems.  Discovery would shed light on the factual basis for these assertions.

Finally, the Court should have before it a copy of the motion adopted by the SSCI approving the report and setting limits on its distribution, as well as further communication about the approval or disapproval of Executive Branch employees. While Plaintiff does not dispute the authenticity of the documents produced by Defendant, there is no explanation as to whether any other relevant documents exist.

In his dissent in *Goland*, Judge Bazelon sets forth compelling reasons why discovery should be allowed in cases involving the property-control test.  607 F.2d at 357-58, 362. For the reasons set forth by Judge Bazelon, discovery or, for classified information, an *ex parte, in camera* declaration, is necessary to resolve factual ambiguities.

## IV.    Segregability

In *United We Stand*, 359 F.3d at 603-04, the D.C. Circuit first held that part of a document could be an agency record while a different part of the document could be non-agency record.  While Plaintiff believes that the entire Report is an agency record, the fact that the Chair of the SSCI, Sen. Feinstein, has specifically called for the release of the Executive Summary of the Report, (Ex. 7 at 1) provides especially strong support for a finding that the SSCI did not intend to retain control over the Executive Summary in particular.  Thus, the Court may resolve the pending motion in favor of Plaintiff even if it is not convinced that the entire Report is an agency record.

## V.    The effect of multiple agencies having copies of the record sought by Plaintiff

In this case, Plaintiff named a single defendant, the Department of Justice.  Other agencies, including the CIA, also have a copy of the Report sought by Plaintiff.  In a related case pending before this Court, the ACLU seeks access to a copy of the Report and has named the CIA as the defendant.

No cases in this jurisdiction appear to address how the analysis under the four-part test, the control-property test, or the *Tax Analysts II* test should be performed where multiple Executive Branch agencies have possession of the record sought by a FOIA requester.  In order to obviate the need to resolve this potentially difficult issue, Plaintiff has now submitted a FOIA request to the CIA requesting a copy of the Executive Summary of the Report.  It is Plaintiff's intention to confer with Defendant and make such further procedural motions as are necessary to avoid unnecessary expenditure of judicial resources.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should construe Defendant's motion as one for

summary judgment and deny it.

Respectfully Submitted,

_/s/ Jeffrey Light_____

Jeffrey L. Light
D.C. Bar #485360
1712 Eye St., NW
Suite 915
Washington, DC 20006
(202)277-6213
Jeffrey.Light@yahoo.com

*Counsel for Plaintiff*

Dated: February 18, 2014