## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**JASON LEOPOLD,**

    **Plaintiff,**

      **v.**

**CENTRAL INTELLIGENCE AGENCY,**

    **Defendant.**

**Civil Action No. 13-1324 (JEB)**

## MEMORANDUM OPINION

They say the devil is in the details, and that apparently is where Plaintiff Jason Leopold hopes to find him.  In this Freedom of Information Act suit, he challenges a number of redactions from the Senate Select Committee on Intelligence's report regarding the CIA's former detention and interrogation program.  More particularly, he seeks to uncover the specific amounts that the Agency spent on certain activities related to the program.  The CIA has thus far refused to disclose these sums, contending that they are protected under FOIA Exemptions 1 and 3.  The government and Leopold have now cross-moved for summary judgment.  Because the Court finds that the Agency's invocation of both exemptions is sound, it will grant Defendant's Motion and deny Plaintiff's.

**I.**    **Background**

    A.  The SSCI Study and Executive Summary

In 2009, the Senate Select Committee on Intelligence began studying the CIA's highly controversial detention and interrogation program.  See Def. Mot., Exh. 1 (Declaration of Martha M. Lutz, Chief of the Litigation Support Unit, CIA), ¶ 5.  Three years later, in December 2012, it approved a draft of its "Committee Study of the CIA's Detention and Interrogation Program" and

provided it to the Executive Branch for review and comment.  See id.  After incorporating

feedback from the CIA and the Committee's Minority Staff, the SSCI sent a revised Executive

Summary of the report to the President in April 2014 for declassification review.  See id.  The

letter that accompanied the document requested that the President declassify it "quickly and with

minimal redactions."  Def. Mot., Exh. B (Letter from Sen. Feinstein to President Obama, April 7,

2014).

     The Director of National Intelligence, the CIA, and other Executive Branch agencies

conducted a declassification review, and on August 1, 2014, the DNI provided the President with

a declassified and redacted version, which was delivered to the Committee the same day.  See

Lutz Decl., ¶ 6.  The SSCI and the Executive Branch thereafter "engaged in extensive

discussions" about additional information that the Committee wished to see released.  Id.  The

Committee subsequently provided the Executive Branch with an updated draft of the Executive

Summary for further review.  See id.  In December 2014, a declassified version was provided to

the SSCI "for its unrestricted disposition," and the Committee promptly released it to the public.

See id.

     This final version of the Executive Summary was 499 pages, only about 7% of which was

redacted.  See id., ¶ 8.  Most of the redactions were made at the behest of the CIA, although

some were performed at the request of the State Department, the National Security Agency, the

Department of Defense, and the Federal Bureau of Investigation.  See id.

    B.  Plaintiff's Request

     In the midst of this back-and-forth, Plaintiff caught wind that the Department of Justice

might have a copy of the Committee's Study.  He thus sent a FOIA request to DOJ on August

16, 2013, seeking the Executive Summary.  See Compl., ¶ 11.  When Justice did not respond

within the timeframe he believed permissible, Plaintiff filed this suit against the Department on

September 2, 2013.  See id., ¶ 15.  Later, as litigation was underway, he sent a second request for

the Executive Summary to the CIA.  See Def.'s Statement of Facts, ¶ 1.  After that agency failed

to timely respond, he filed a Second Amended Complaint that substituted the CIA as Defendant.

See ECF No. 24.

Plaintiff, of course, now has access to the document he originally sought.  As just

mentioned, a minimally redacted version of the Executive Summary was made public in

December 2014.  His curiosity, however, has not been satisfied.  He continues to challenge

twenty-eight specific redactions from the document, all of which relate to the CIA's proposed

and actual expenditures on the detention and interrogation program.  More specifically, he lists

the redactions he challenges as follows:

- The amount of money provided to Bismullah upon his release ([page] 16)
- The amount of money the CIA provided to an unknown country (74 & n.383)
- The dollar value of the "wish list" (97)
- The amount of money provided above and beyond the requested subsidy (97)
- The amount of money offered to "show appreciation" for support of a program (99, two redactions)
- The amount of payments to Habib, Mohammed, and Awadh (111 n.643, three redactions)
- The amount of money the CIA set aside for a facility's construction (139)
- The amount of money offered to an unknown country for hosting a CIA detention facility, and the amount actually made available (139 n.842, two redactions)
- The values of the proposed subsidies (140, two redactions)
- The amount of money given by the CIA (140 n.843, two redactions)
- The cost of the CIA detention facility (142)
- The amount provided by the CIA to an unknown country (154)
- The amount of compensation to a liaison for medical treatment (154 n.934)

- The amount the CIA previously invested in a new facility and its eventual cost (156)
- The amount of reduction to CIA/CTC's Rendition and Detention Program (174 n.1050, 175 n.1054, 288 n.1622, 291 n.1638, 338 n.1904)

Pl.'s Opp. & Cross-Mot. at 2-3.  These can be roughly categorized as: (1) the costs of CIA detention facilities abroad; (2) amounts paid to unknown countries; (3) the size of monetary cuts to CIA intelligence programs; (4) sums given to previously detained individuals; and (5) compensation for medical services.  The CIA insists on the propriety of these redactions, claiming that the information is shielded from disclosure by FOIA Exemptions 1 and 3.  Both parties now seek summary judgment.

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

4

FOIA cases typically and appropriately are decided on motions for summary judgment. See Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011).  In a FOIA case, a court may grant summary judgment based solely on an agency's affidavits or declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted).  Such affidavits or declarations are accorded "a presumption of good faith."  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991).

Further, "[b]ecause courts lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case, [they] must accord substantial weight to an agency's affidavit." ACLU v. Dep't of Defense, 628 F.3d 612, 619 (D.C. Cir. 2011) (internal citation and quotation marks omitted).  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" Judicial Watch, Inc. v. Dep't of Defense (Judicial Watch I), 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting ACLU, 628 F.3d at 619).

## III.   Analysis

Congress enacted FOIA in order "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (citation omitted).  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989) (citation omitted).  The FOIA statute, accordingly, provides that "each agency, upon

any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . .  shall make the records promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless the records fall within one of nine narrowly construed exemptions. See 5 U.S.C. § 552(b); Rose, 425 U.S. at 361.  Consistent with this statutory mandate, federal courts have jurisdiction to order the production of records that an agency improperly withholds. See 5 U.S.C. § 552(a)(3); Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989).

"Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'"  Reporters Comm., 489 U.S. at 755 (quoting 5 U.S.C. § 552(a)(4)(B)).  "At all times courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure' . . . ."  Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting Dep't of State v. Ray, 502 U.S. 164, 173 (1991)).

In the present case, the CIA asserts that the challenged redactions are properly withheld under Exemptions 1 and 3.  These exemptions are "independent" of one another, meaning that the Court "may uphold [the] agency['s] action under one exemption without considering the applicability of the other."  Larson, 565 F.3d at 862-63.  Employing a belt-and-suspenders approach here, the Court examines both, ultimately concluding that either suffices to support the agency's withholdings.  It will begin its analysis with Exemption 3 and then turn to Exemption 1.  Before embarking, however, the Court addresses Leopold's argument that the Agency should have separately explained its reasons for redacting each of the twenty-eight expenditures.

A.  Adequacy of Affidavits

Plaintiff first contends that the CIA's "categorical approach" to justifying its redactions was improper.  See Pl.'s Opp. & Cross-Mot. at 4.  In his view, the Agency should have provided "a specific rationale for the withholding of each piece of information," as opposed to lumping them together.  Id. at 4-5.

Although the Court agrees that it would have been helpful – and an easier case – had the Agency broken the expenditures out further in its affidavits, it believes that the CIA has nonetheless provided adequate specificity to allow for summary judgment here.  In evaluating the sufficiency of an agency's affidavits, the principal focus is on the ability of the FOIA requester and the Court to evaluate the government's exemption claims.  See, e.g., Morley v. CIA, 508 F.3d 1108, 1123 (D.C. Cir. 2007); King v. Dep't of Justice, 830 F.2d 210, 218 (D.C. Cir. 1987) (explaining that relevant question is whether materials submitted by agency provide "full and specific enough" explanation "to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding").  So long as agencies sufficiently describe the contents of the documents or portions of documents withheld and their connection to specific exemptions, courts have permitted agencies to explain their reasons for withholding by category.  See, e.g., Judicial Watch, Inc. v. Food & Drug Admin. (Judicial Watch II), 449 F.3d 141, 147 (D.C. Cir. 2006) ("We have never required repetitive, detailed explanations for each piece of withheld information – that is, codes and categories may be sufficiently particularized to carry the agency's burden of proof."); Bevis v. Dep't of State, 801 F.2d 1386, 1389-90 (D.C. Cir. 1986) (approving agency's categorical approach where categories adequately "define[d] the nature of

7

the information contained in the included documents" and "allow[ed] the court to assess the

FBI's representations" about their protected status).

Here, although the CIA did not walk through the redactions one by one, its affidavits,

read in conjunction with the released portions of the Executive Summary, provide sufficient

detail for Leopold and the Court to evaluate whether they fall within the scope of Exemptions 1

and 3.  The content of the information withheld is clear, as evidenced by Leopold's own rather

specific articulation of the expenditures he wishes to unveil.  As will be shown below, the

agency's affidavits also "linked the substance of each exemption to the [redactions'] common

elements."  Judicial Watch II, 449 F.3d at 147.  Nothing further is required.  See Morley, 508

F.3d at 1123 (affirming summary judgment in favor of CIA where its descriptions, "while

categorical and with little variation . . . , convey enough information for . . . the court to identify

the records referenced and understand the basic reasoning behind the claimed exemptions");

Gallant v. NLRB, 26 F.3d 168, 173 (D.C. Cir. 1994) ("We consider the government under no

obligation here to justify the withholding of the names of the fax recipients on an individual-by-

individual basis under FOIA Exemption 6 . . . .").

In sum, the agency's declarations have provided enough detail to allow Leopold and the

Court to determine whether the information withheld logically and plausibly falls within

Exemptions 1 and 3.  The Court now turns to those exemptions.

B.  Exemption 3

Exemption 3 permits agencies to withhold information "specifically exempted from

disclosure by statute" if that statute either "(A)(i) requires that the matters be withheld from the

public in such a manner as to leave no discretion on the issue; or (A)(ii) establishes particular

criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. §

552(b)(3).  Here, the CIA principally invokes Section 102A(i)(1) of the National Security Act of

1947, 50 U.S.C. § 3024(i)(1), which provides that "[t]he Director of National Intelligence shall

protect intelligence sources and methods from unauthorized disclosure."

Plaintiff does not dispute that the National Security Act satisfies the second criterion

mentioned above because it "refers to particular types of matters to be withheld" – namely,

"intelligence sources and methods."  See, e.g., ACLU, 628 F.3d at 619 (holding Act qualifies as

exemption statute under Exemption 3).  The principal question, then, is whether the CIA's

redactions "satisfy the criteria of the exemption statute."  Fitzgibbon v. CIA, 911 F.2d 755, 761

(D.C. Cir. 1990)).  In other words, do they in fact "protect intelligence sources and methods"?

The D.C. Circuit has interpreted this provision broadly, holding that material is properly

withheld under the Act if it "relates to intelligence sources and methods," Larson, 565 F.3d at

865 (emphasis added), or "can reasonably be expected to lead to unauthorized disclosure of

intelligence sources and methods."  Halperin v. CIA, 629 F.2d 144, 147 (D.C. Cir. 1980).  Courts

have also recognized that the Act's protection of sources and methods is a "near-blanket FOIA

exemption," Whalen v. U.S. Marine Corps, 407 F. Supp. 2d 54, 59 n.5 (D.D.C. 2005), which

includes the "power to withhold superficially innocuous information on the ground that it might

enable an observer to discover the identity of an intelligence source [or method]."  CIA v. Sims,

471 U.S. 159, 178 (1985).  This is so because in the intelligence context "bits and pieces of data

may aid in piecing together bits of other information even when the individual piece is not of

obvious importance in itself."  Id. (internal quotation marks and citation omitted).  The Supreme

Court has also warned that "it is the responsibility of the [intelligence community], not that of

the judiciary, to weigh the variety of complex and subtle factors in determining whether

disclosure of information may lead to an unacceptable risk of compromising the . . . intelligence-gathering process." Id. at 180.

As to the expenditures at issue here, the Agency has adequately demonstrated that their release could reveal sensitive information about its sources and methods.  Martha Lutz, the Chief of the CIA's Litigation Support Unit, noted in her first declaration that "[e]ven seemingly innocuous details such as . . . funding amounts associated with a particular program could reveal broader intelligence priorities and the source and methods of certain intelligence collection when juxtaposed with other publicly-available data."  Lutz Decl., ¶ 29.  She further explained that "[d]isclosing intelligence expenditures would show the level of funding devoted to certain activities, which in turn would reveal the resources available to the Intelligence Community and the intelligence priorities of the U.S. Government."  Id.  Her supplemental affidavit elaborated on these points, noting that "disclosing the amounts of these various expenditures could provide insight to adversaries as to the resources available to, and by extension the capabilities of, the Agency," and that, "in some cases, the amount of money spent for a given activity could allow for the identification of the foreign country that provided assistance to the CIA."  Second Lutz Decl., ¶ 5.

Given the considerable deference that the Court owes to the Agency in this context, it finds this explanation to be reasonable.  It is, for instance, plausible that disclosing most of these expenditures, including "[t]he amount of money offered to an unknown country for hosting a CIA detention facility," "the cost of [a] CIA detention facility" in an unidentified country," and "[t]he amount of money offered to 'show appreciation' for support of a program," see Pl.'s Opp. & Cross-Mot. at 2 (citations omitted), could provide insight into which countries aided the CIA's efforts.  It is also not difficult to conclude that unveiling the redacted sums, including the size of

proposed budget cuts and the amounts given to detainees upon their release, could shed light on the funds that were available for particular activities, which could, in turn, divulge the agency's capabilities and priorities.  A trained intelligence analyst might, for instance, be able to deduce the relative importance that the CIA placed on each detainee or the interrogation methods that were applied from the amounts spent on his medical treatment or given to him as compensation.[1]

Such a conclusion finds support in prior decisions holding that the funds available to the CIA and spent on its activities are protected under Exemption 3.  In Halperin, for instance, the agency asserted that the rates and fees it paid to attorneys were exempt from disclosure because they "could give leads to information about covert activities that constitute intelligence methods" by indicating the "size and nature of the operation."  629 F.2d at 150.  The court agreed, noting that "[w]hen combined with other small leads, the amount of a legal fee could well prove useful for identifying a covert transaction."  Id.  More recently, in Aftergood v. CIA, 355 F. Supp. 2d 557 (D.D.C. 2005), a district court concluded that "intelligence budget information" is protected because it "relates to intelligence methods, namely the allocation, transfer and funding of intelligence programs."  Id. at 562 (internal quotation marks omitted); see also Military Audit Project v. Casey, 656 F.2d 724, 750 (D.C. Cir. 1981) (upholding CIA's withholding of amounts spent in connection with particular CIA operation).

In opposition, Leopold's principal challenge is that "[t]he link between the amount of the expenditures and the government's intelligence priorities . . . is too tenuous to support the claimed exemptions."  Pl.'s Opp. & Cross-Mot. at 7.  He notes that, unlike the plaintiff in

---

[1] The CIA has also invoked Section 6 of the CIA Act, 50 U.S.C. § 3507, see Lutz Decl., ¶ 20, which Plaintiff does not dispute is a qualifying exemption statute.  See Halperin, 629 F.2d at 147.  Among other things, the provision exempts from disclosure the "salaries . . . of personnel employed by the Agency."  50 U.S.C. § 3507.  This includes "any payments made in compensation for services performed by personnel employed by the Agency," including "temporarily affiliated personnel."  Halperin, 629 F.2d at 151.  The compensation paid to a "liaison for medical treatment," see Pl.'s Opp. & Cross-Mot. at 2, would thus seem to be protected by Section 6 of the CIA Act as well.

Aftergood, he is not requesting "the CIA's entire intelligence budget, which would clearly reveal priorities." Id.  He also asserts that, unlike Halperin, the requested information would not "implicate the size and nature of covert operations." Id.  For instance, he believes that the amounts paid to former detainees upon their release were "nominal amount[s,] which would reveal nothing about the CIA's intelligence priorities." Id.  Likewise, in his view, the value of a "wish list" for a CIA station could not "indicate in any way the government's priorities" because it would "not reveal an expenditure at all, but simply the amount of money desired by the CIA Station." Id. (emphasis added).

These arguments, however, are unconvincing.  In essence, Leopold asks the Court to credit his judgments about the effects of disclosure over those of the agency.  This is something it clearly cannot do.  See, e.g., Larson, 565 F.3d at 865 ("If an agency's statements supporting exemption contain reasonable specificity of detail as to demonstrate that the withheld information logically falls within the claimed exemption and evidence in the record does not suggest otherwise, . . . the court should not conduct a more detailed inquiry to test the agency's judgment and expertise or to evaluate whether the court agrees with the agency's opinions."). Plaintiff has offered no support for his contention that small expenditures cannot reveal sensitive information about the CIA's sources and methods.  This Circuit, furthermore, has consistently cautioned that "[m]inor details of intelligence information may reveal more information than their apparent insignificance suggests because, much like a piece of jigsaw puzzle, [each detail] may aid in piecing together other bits of information . . . ." Id. at 864 (some alterations in original, internal quotation marks and citation omitted).  The Court, additionally, sees no principled reason to find that only actual expenditures, as opposed to proposed expenditures, could reveal information about the agency's sources and methods.  It would seem entirely

plausible, for instance, that the proposed expenditures related to a CIA facility could just as easily reveal sensitive information about its location, purpose, and methods.

Leopold also questions the Agency's rationale for withholding on the ground that it revealed similar expenditures in other parts of the Executive Summary.  See Pl.'s Opp. & Cross-Mot. at 8.  As an example, he points out that the CIA disclosed that it had "approved more than $200,000 for the construction of [a] facility, identified in th[e] summary as DETENTION SITE COBALT."  Id. (internal quotation marks and citation omitted).  Because the Agency disclosed these similar figures "apparently without divulging the Intelligence Community's resources or priorities," he contends that it is simply not plausible that releasing the sums he seeks would reveal anything about the Intelligence Community's resources or priorities.  Id.

The Supreme Court rejected a similar argument, however, in Sims.  There, the plaintiffs contended that "because the Agency ha[d] already revealed the names of many of the institutions at which . . . research was performed, the Agency [wa]s somehow estopped from withholding the names of others."  Sims, 471 U.S. at 180.  The Court explained that such a suggestion "overlook[ed] the political realities of intelligence operations" and that "[t]he national interest sometimes makes it advisable, or even imperative, to disclose information that may lead to the identity of intelligence sources."  Id.  Because it was "the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process," the Court did not find that the prior release of analogous information undermined the Agency's withholdings.  Id.; see also Ctr. for Nat'l Sec. Studies v. Dep't of Justice, 331 F.3d 918, 930-32 (D.C. Cir. 2003) (rejecting argument that government's "predictive judgment" regarding harms from releasing detainees' names was

undermined by prior release of others); <u>Students Against Genocide v. Dep't of State</u>, 257 F.3d

828, 835 (D.C. Cir. 2001) ("The fact that some 'information resides in the public domain does

not eliminate the possibility that further disclosures can cause harm to intelligence sources,

methods and operations.'") (quoting <u>Fitzgibbon</u>, 911 F.2d at 766).

 If anything, the release of seemingly analogous figures under the circumstances of this

case would seem to evidence the Agency's good faith in deciding that the redacted expenditures

must remain hidden.  As discussed previously, the SSCI and the Executive Branch engaged in an

extensive back-and-forth regarding classified information that the Committee wished to see

released.  The Agency explained in its supplemental affidavit that it ultimately declassified

certain information pursuant to Section 3.1(d) of Executive Order 13,526.  <u>See</u> Second Lutz

Decl., ¶ 2 (citing Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009)).  That provision

"recognizes that '[i]n some exceptional cases . . . the need to protect . . . information [that

continues to meet the classification requirements] may be outweighed by the public interest in

disclosure of the information, and in these cases the information should be declassified.'"  <u>Id.</u>

(alterations in original) (quoting E.O. 13,526, § 3.1(d)).  The government, accordingly, "made

the decision to declassify much of the Executive Summary and to retain the classification only

for certain discrete pieces of national security information."  <u>Id.</u>, ¶ 3.  Far from casting doubt on

the Agency's judgments about which sums could lead to the unauthorized disclosure of its

sources and methods, the release of other expenditures suggests that the CIA has only withheld

those that would unjustifiably compromise our national security.  <u>See</u> <u>Students Against

Genocide</u>, 257 F.3d at 835 ("[P]articularly because the government did release numerous

photographs, we see no reason to question its good faith in withholding the remaining

photographs on national security grounds.").

To the extent, moreover, that this may be read as some type of waiver argument, an agency only waives its right to assert an otherwise valid exemption defense when it has officially acknowledged the precise information at issue.  See ACLU, 628 F.3d at 620-21.  That is, "the information requested must match the information previously disclosed," Wolf v. CIA, 473 F.3d 370, 378 (D.C. Cir. 2007) (quoting Fitzgibbon, 911 F.2d at 765), and a "[p]rior disclosure of similar information does not suffice."  Id. (citing Public Citizen v. Dep't of State, 11 F.3d 198, 201, 203 (D.C. Cir. 1993)) (emphasis added).  The fact that the Agency divulged certain costs but not others thus does not vitiate its exemption claim here.

Leopold last suggests that the historical nature of the figures and the fact that Congress now requires the disclosure of aggregate budget data undermines the Agency's assertions that these numbers could result in the unauthorized disclosure of its sources and methods.  More specifically, he contends that "even if it could be somehow gleaned from the withheld information how much funding was available to the Intelligence Community five or ten years ago when the Detention and Interrogation Program was operating, it would say little about present funding levels."  Pl.'s Opp. & Cross-Mot. at 8.  Yet the Agency explained in its affidavit that "the fact that these figures are historic does not mitigate these harms because information about current funding levels, intelligence priorities, and Agency resources can be extrapolated from the redacted amounts."  Second Lutz Decl., ¶ 5; see also, e.g., Aftergood, 355 F. Supp. 2d at 559 (historical budget information from 1947 to 1970 was protected under Exemption 3).  Leopold has not presented any contrary evidence to call this conclusion into question.  The Court also fails to see the relevance of the fact that the Intelligence Community now releases its yearly aggregate budget figure.  As the government points out in its Reply, there are obvious

differences between releasing an aggregate figure and more specific expenditures, which could provide better insight into funding levels for specific activities.

In sum, although certain intelligence expenditures at issue here may be reasonably close calls, the Court believes that all are properly withheld under Section 102A(i)(1) of the National Security Act and Exemption 3. Such a conclusion is alone sufficient to grant summary judgment in favor of Defendant. The Court will nevertheless address the parties' arguments regarding Exemption 1.

C. Exemption 1

Exemption 1 permits agencies to withhold information that is "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and is "in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). In this case, the CIA asserts that the redacted information is properly classified under Executive Order 13,526. See Lutz Decl., ¶ 9. That order permits the government to classify information if four criteria are satisfied: "(1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the United States Government; (3) the information falls within one or more of the categories of information listed in section 1.4 of th[e] order; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, . . . and . . . is able to identify or describe the damage." E.O. 13,526, § 1.1(a). In evaluating whether these elements are met, the Court is cognizant that it must "accord substantial weight to an agency's affidavit concerning the . . . classified status of the disputed [information]." See Larson, 565 F.3d at 864 (internal quotation marks and citation omitted).

The first two requirements are easily addressed.  Lutz declares – and Plaintiff does not dispute – that she has been delegated original Top Secret classification authority, and that the information is within the United States' control.  See Lutz Decl., ¶¶ 11, 12.  The parties instead spar over the third and arguably the fourth prongs.  The Court will thus focus its discussion on these latter two.

### 1. *Claimed Categories of Information*

As noted above, the third requirement is that the information fall within one or more of the categories specified in Section 1.4 of the order.  That section, in turn, provides that information may be classified if it "pertains to" one of eight enumerated categories.  See E.O. 13,526, § 1.4.  The CIA invokes two of them here: "(c) intelligence activities (including covert action), intelligence sources or methods, or cryptology"; and "(d) foreign relations or foreign activities of the United States, including confidential sources."  Id. § 1.4(c), (d).

Given the lengthy analysis above, see Part III.B, *supra*, it is clear that the information falls within § 1.4(c) because it "pertains to" intelligence activities, sources, and methods.  See Larson, 565 F.3d at 865.  Plaintiff, in fact, concedes that the "question under Exemption 1 is the same" as the question under Exemption 3 in this case.  See Pl.'s Cross-Mot. & Opp. at 3.

While satisfying that category alone would be sufficient, Lutz has also shown that these sums also relate to foreign activities and relations.  She explained that all of them concern "payments provided to foreign governments and foreign nationals, the amount of money expended to construct facilities abroad, and amounts reflecting the resources devoted to the former detention and interrogation program which took place overseas."  Second Lutz Decl., ¶ 4. It is difficult to gainsay that the United States' giving money to foreign countries or to foreign nationals pertains to foreign relations and activities, or that spending sums to build facilities on

foreign soil falls under the same umbrella.  See, e.g., Judicial Watch I, 715 F.3d at 941 (finding

images related to Osama bin Laden's death "pertained" to foreign activities because they

"document[ed] events involving American military personnel thousands of miles outside of

American territory").

    Leopold argues in his Opposition that the CIA merely "parroted" the language from the

Executive Order in claiming that the expenditures relate to foreign relations and activities.  See

Pl.'s Reply at 3.  The Agency is, however, permitted to use the language of the order in

explaining its reasoning.  See Judicial Watch II, 449 F.3d at 147 ("[W]e do not fault the FDA for

using the language of the statute as part of its explanation for withholding documents.  As long

as it links the statutory language to the withheld documents, the agency may even 'parrot[]' the

language of the statute.") (alteration in original) (quoting Landmark Legal Found. v. IRS, 267

F.3d 1132, 1138 (D.C. Cir. 2001)).  The Court is unsure what more Plaintiff would expect.  This

Circuit has noted that "'pertains' is 'not a very demanding verb.'"  Judicial Watch I, 715 F.3d at

941 (citation omitted).  It seems rather clear that the expenditures at issue in this case – which

relate to the United States' interrogation and detention activities in foreign countries to extract

information from foreign nationals – pertain to its foreign activities and relations.  Despite

having access to the unredacted portions of the Executive Summary, moreover, which indicate

the nature of the redacted expenditures, Plaintiff has not pointed to any particular expenditures

that he believes do not properly fall within this category.

    The redacted information thus satisfies the third element for classification.

        2.  *Potential Harm*

    That leaves the fourth requirement that the CIA establish a certain level of potential harm

from disclosure.  See E.O. 13,526, § 1.1(a)(4).  While asserting that he does not concede the

point, Leopold does not specifically challenge the Agency's showing on this front.  Even

assuming he has adequately preserved the issue, which the Court doubts, it is clear that he would

not prevail.

As a backdrop, an agency may classify information at one of three specified classification

levels.  See § 1.2.  For each of these levels, E.O. 13,526 establishes a corresponding amount of

damage to national security that the agency must describe in order to withhold the information.

See §§ 1.4; 1.2.  Because the redactions at issue here were classified as "Top Secret," see Lutz

Decl., ¶ 14, the CIA must show that disclosure of the redacted information "reasonably could be

expected to cause exceptionally grave damage to the national security."  E.O. 13,526, § 1.2(1).

The Court must, of course, give substantial weight to the Agency's judgments about potential

harms from disclosure "[b]ecause courts 'lack the expertise necessary to second-guess such

agency opinions in the typical national security FOIA case.'"  ACLU, 628 F.3d at 619 (quoting

Krikorian v. Dep't of State, 984 F.2d 461, 464 (D.C. Cir. 1993).  The CIA's burden is thus "a

light one," and its arguments "need only be both 'plausible' and 'logical.'"  Id. at 624.

In its affidavits, the Agency has identified several ways in which the disclosure of the

redacted information could cause exceptionally grave harm.  As already discussed, the

information could "reveal broader intelligence priorities and the source and methods of certain

intelligence collection."  Lutz Decl., ¶ 29.  For instance, it could "allow for the identification of

the foreign countr[ies] that provided assistance to the CIA – details that remain classified in the

released Executive Summary."  Second Lutz Decl., ¶ 5.  According to the Agency, disclosing the

existence of such relationships can inhibit its efforts by, among other things, "suggest[ing] to

other foreign liaison services and foreign government officials that the U.S. Government is

unable or unwilling to observe an express agreement of absolute secrecy," thereby "caus[ing]

foreign liaison services to curtail cooperation on counterterrorism operations or other activities affecting U.S. national security." Lutz Decl., ¶ 27.  Releasing certain of the redacted figures could also "lead to the comparison of different payments by foreign partners," which could "damage the relationships between the U.S. Government and foreign governments," "negatively impact the CIA's ability to work collaboratively with these countries on other areas of concern," and "impair the Agency's ability to collect intelligence in the future."  Second Lutz Decl., ¶ 5.  As further cause for concern, the CIA has stated that the "[r]elease of the specific amounts would . . . adversely impact current and future operations as countries and individuals would be able to use these monetary figures as a starting point for negotiations on other matters."  Id.

The Court finds these predictions of harm both logical and plausible, and it sees no reason to second guess them.  Because the CIA has thus complied with the procedural and substantive requirements for classifying the information under Executive Order 13,526, it may also properly withhold it under Exemption 1.

D.  Segregability

Finally, the Court must consider whether there are any reasonably segregable portions of the requested information that should be released.  See 5 U.S.C. § 552(b); see also Trans-Pacific Policing Agreement v. U.S. Customs Serv., 177 F.3d 1022, 1028 (D.C. Cir. 1999) (courts have sua sponte obligation to consider segregability).  It is clear that there are none here.  The agency has stated that it conducted a "page-by-page and line-by-line review . . . and concluded that all reasonably segregable non-exempt information has been released."  Lutz Decl., ¶ 42.  Given the discrete nature of the information Leopold seeks, it is rather obvious that the Agency could not disclose anything further without revealing what is protected.

\*        \*        \*

In sum, the CIA's affidavits, which are accorded substantial weight, describe the justifications for nondisclosure with reasonably specific detail and demonstrate that the information withheld logically and plausibly falls within Exemptions 1 and 3.  While "evidence of agency bad faith" could preclude summary judgment, <u>Larson</u>, 565 F.3d at 862, there is no such evidence presented here.  On the contrary, the 499-page Executive Summary that was publicly released contains minimal redactions.  <u>See</u> Lutz Decl., ¶ 8.  The Agency also released information that would ordinarily be classified because it determined that it was in the public interest to do so.  In light of the deference that it is owed in matters of national security and the extensive declassification process undertaken here, the Court is satisfied that the CIA has met its burden to show that the twenty-eight expenditures are properly withheld.

**IV.    Conclusion**

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's.  A contemporaneous Order will so state.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: <u>May 14, 2015</u>